UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MYRON JESSIE, #701078,                          Case No. 2:22-cv-54

                    Plaintiff,                  Hon. Paul L. Maloney
                                                U.S. District Judge
        v.

MARK HARRIS, et al,

                    Defendants.
_____/

**REPORT AND RECOMMENDATION**

## I.    Introduction

This Report and Recommendation (R&R) addresses the exhaustion-based motion for summary judgment filed by Defendants Harris and Hares (ECF No. 34).

Plaintiff — state prisoner Myron Jessie — filed suit pursuant to 42 U.S.C. § 1983 on March 16, 2022.  In his verified complaint, Jessie asserted that while he was incarcerated at the Marquette Branch Prison (MBP) in Marquette, Michigan, members of his mental health team violated his rights under the Eighth Amendment as well as various state laws[1] and policies of the Michigan Department of Corrections (MDOC).  (ECF No. 1, PageID.11-13.)  More specifically, Jessie alleged that Defendants Qualified Mental Health Professional (QMHP) Harris, Community Health Services Manager (CHSM) Hares, and Psychiatrist Beaudoin provided him

_____

[1]    Including negligence, intentional infliction of emotional distress, medical malpractice, and violations of the Mental Health Code Act 258 of 1974.

with inadequate mental health care, and that QMHP Harris sexually harassed him. (ECF No. 1, PageID.3-8.)

In its October 3, 2022 screening opinion, the Court dismissed all but the following claims: (1) Jessie's Eighth Amendment claims against Defendant Harris for verbally and sexually harassing Jessie, (2) Jessie's Eighth Amendment claims against Defendants for providing him with inadequate mental health care, and (3) Jessie's state law claims against Defendants.

Defendants Harris and Hares now move for summary judgment, asserting that Jessie did not properly exhaust his administrative remedies prior to filing suit. (ECF No. 34.) More specifically, QMHP Harris and CHSM Hares argue that Jessie had to exhaust his sexual harassment claim against QMHP Harris through the MDOC's Prison Rape Elimination Act (PREA) grievance process, and that he did not. (ECF No. 35, PageID.196.) They further argue that Jessie had to pursue his claims of inadequate mental health care through the traditional grievance process, and that he did not. (*Id.*) Defendants say that although Jessie filed grievances against them, the grievances were either rejected as improper, or were not appealed through all steps of the relevant grievance process. (*Id.*, PageID.196-199.)

The undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment. The record reflects that Jessie submitted grievance MBP-21-05-472-12B3 complaining that Harris and Hares were providing him with inadequate mental health care, and that Harris was sexually harassing him. The grievance was rejected at Step I as containing multiple issues, although the

Respondent considered the merits of each issue and noted that "each issue is unsubstantiated and would be denied if filed individually."  In addressing Jessie's Step II appeal, the Respondent denied the grievance on its merits.  Then, in addressing Jessie's Step III appeal, the Respondent rejected the grievance due to a newly cited but pre-existing defect: that there was no evidence that Jessie attempted to resolve his complaints in accordance with policy prior to filing his grievance.  In the opinion of the undersigned, there are genuine issues of material fact as to whether prison staff waived the procedural defects in grievance MBP-21-05-472-12B3 and whether grievance MBP-21-05-472-12B3 was properly rejected at Steps I and III.

## II.    Factual Allegations

Jessie says that he first started seeing QMHP Harris in late summer of 2017. (ECF No. 1, PageID.4.)  During a group meeting, Harris asked if anyone had anything to share or any questions to ask.  Jessie says that when he started talking about his treatment, Harris "shut him down" and said that he did not care.  Jessie says that he blacked out and kicked a chair, leading QMHP Harris to issue Jessie a misconduct ticket.  (*Id.*)  Thus began Jessie's attempts to get Harris to take Jessie and his mental health seriously as well as Harris's pattern of disregard for Jessie's mental health needs.

At some point before May 20, 2020, Jessie says that he politely asked QMHP Harris to remove himself from Jessie's case because Jessie believed that Harris was deliberately indifferent to his needs.  (*Id.*, PageID.5.)  Jessie says that Harris refused

to believe the majority of what Jessie told Harris during their appointments, which led Jessie to become suicidal.  (*Id.*)

On May 20, 2020, Jessie says that he was meeting with QMHP Harris and CHSM Hares when Harris waited until Hares was out of earshot and then called Jessie a crybaby and told Jessie that if he needed favors going forward, Jessie would have to perform oral sex on Harris. (*Id.*) Jessie believes that Harris made this statement because Jessie had previously informed Harris that he is bisexual.

Jessie says that he tried to tell CHSM Hares about Harris's remarks later on, but Hares dismissed Jessie's claim as a lie.  Jessie says that this caused him to experience a "downward spiral."  (*Id.*)

According to Jessie, other inmates began to taunt and tease him for his sexuality, again leading him to become suicidal.  He says that he began blacking out and attempting suicide during those blackouts.  (*Id.*)  Jessie says that he had voices in his head that became louder and more persistent, telling him to hurt himself and others.  On at least one occasion, Jessie says that he was sent to the emergency room for a blood transfusion following a suicide attempt.  (*Id.*, PageID.6.)  Even still, Jessie says that he received essentially no treatment from QMHP Harris.  (*Id.*)  And Jessie alleges that CHSM Hares went so far as to forge documents related to assessments of Jessie that never occurred.  (*Id.*, PageID.8.)

In addition to his complaints against Harris and Hares, Jessie says that his psychiatrist, Defendant Dr. Beaudoin, failed to diagnose Jessie with a major mental disorder.  (Id., PageID.7.)  Jessie says that the diagnosis would have made him

eligible for certain treatments and programs, so that Jessie could experience a more therapeutic environment.  (*Id.*)

### III.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury[2] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[2]    If defendants move for summary judgment on the basis of exhaustion under the PLRA, and the court determines that there is a genuine issue of material fact, the issue need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015). Instead, the court may conduct a bench trial to resolve the issue.  (*Id.*)  In a bench trial on exhaustion, the defendants must show that the plaintiff failed to exhaust his administrative remedies by a preponderance of the evidence.  *Id.* at 677 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)) ("Failure to exhaust administrative remedies is an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence."); *Richards v. Perttu*, No. 2:20-CV-76, 2022 WL 842654, at *1 (W.D. Mich. Mar. 22, 2022) (affirming a magistrate judge's ruling that the preponderance of the evidence standard applies in a bench trial on exhaustion).

## IV.    Exhaustion

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).  "[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).  A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999).

To properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524. In the Court's view, this objective was achieved in three ways. First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525. Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737*)*. And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id*. When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison

administration.  *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (effective March 18, 2019) sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint.  Inmates must first attempt to informally resolve a grievable issue within two business days of becoming aware of the issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ Q.  If informal resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted informal resolution.  *Id.* at ¶¶ Q, W.  The inmate submits the grievance to a designated Grievance Coordinator, who assigns it to a respondent.  *Id.* at ¶ W.  The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely.  Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included."  *Id.* at ¶ S (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.  MDOC Policy Directive 03.02.130 at ¶¶ U, DD.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances.  *Id.* at ¶ FF.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ U, HH. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ II.

When the grievance procedures are not available because the issue presented is non-grievable, exhausting those procedures is not required. It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well-known proverb states, they cannot have their cake and eat it too."). However, when other administrative remedies are available, the prisoner is required to exhaust those remedies prior to filing a federal lawsuit.

One alternative administrative remedy that a prisoner may be required to pursue in order to exhaust his claims is the PREA grievance process set forth in

MDOC Policy Directive 03.03.140 (effective Apr. 24, 2017, superseded Apr. 5, 2021).[3]
The PREA grievance process "is a two-step process allowing prisoners to grieve
regarding allegations of sexual abuse."  *Id.* at ¶ EE.  To exhaust the PREA grievance
process, a prisoner must file a PREA Prisoner Grievance Form (CAJ-1038A).  *Id.* at
¶ FF.  If the prisoner receives an unfavorable response, he must then appeal the
response to Step II of the process.  *Id.* at ¶ LL.  Only PREA grievances appealed
through Step II of the PREA grievance process are considered exhausted.  *Id.* at ¶
EE.

When prison officials waive enforcement of these procedural rules and instead
consider a non-exhausted claim on its merits, a prisoner's failure to comply with those
rules will not bar that prisoner's subsequent federal lawsuit.  *Reed-Bey v.
Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).  The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOC PD 130—and
> therefore does not exhaust his administrative remedies under the
> PLRA—when he does not specify the names of each person from
> whom he seeks relief.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322,
> 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison
> remedies in the manner the State provides—by, say, identifying *all*
> relevant defendants—not only furthers [the PLRA's] objectives, but
> it also prevents inmates from undermining these goals by
> intentionally defaulting their claims at each step of the grievance
> process, prompting unnecessary and wasteful federal litigation
> process.").  An exception to this rule is that prison officials waive any
> procedural irregularities in a grievance when they nonetheless
> address the grievance on the merits.  *See id.* at 325.   We have also
> explained that the purpose of the PLRA's exhaustion requirement "is
> to allow prison officials 'a fair opportunity' to address grievances on
> the merits to correct prison errors that can and should be corrected

---

[3]     At least, prior to the MDOC doing away with the PREA grievance process in
April of 2021.  *See* Policy Directive 03.03.140 ¶ V (effective Apr. 5, 2021).

10

to create an administrative record for those disputes that eventually end up in court." *Id.* at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[4]

## V. Analysis

As set forth above, Defendants assert that Jessie was required to exhaust his Eighth Amendment sexual harassment claim against QMHP Hares through the MDOC's PREA grievance process, and his Eighth Amendment deliberate indifference claims through the MDOC's non-PREA grievance process. (ECF No. 35, PageID.197.) Defendants say that Jessie either failed to appeal his grievances through all steps of the relevant process, or that his grievances were rejected as improper in accordance with MDOC policy. (*Id.*, PageID.197-199.) Jessie responded, seemingly referring back to his complaint for his argument regarding exhaustion. (ECF No. 40, PageID.295 ("I, Myron Jessie #701078, am asking/respectfully requesting your Honorable Court to deny Defendants['] motion for Summary Judgment because Defendants motion was redundant and moot as before listing reasons that were already stressed.").)

In his complaint, Jessie alleged that he exhausted his claims against Defendants Harris and Hares via the following grievances: (1) grievance MBP-20-05-33060-PREA, (2) grievance MBP-21-05-472-12B3, (3) grievance MBP-21-03-320-

---

[4]    In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints." *Id.* at 596. For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

12B3, (4) grievance MBP-21-10-1362-7Z.  (ECF No. 1, PageID.8-11.)  The contents of those grievances and their dispositions at each step of the grievance process are summarized in the table below:

| Grievance No. | Defendants Named | Allegation | Step I Response | Step II Response | Step III Response |
|---|---|---|---|---|---|
| MBP-20-05-33060-PREA<br><br>(ECF No. 1-2, PageID.24-25.) | Harris | At the end of Jessie's meeting with Harris and Hares on May 12, 2020, Harris waited until Hares was out of earshot, called Jessie a crybaby and told Jessie that if he needed favors in the future, Jessie would have perform oral sex on Harris. | Insufficient evidence of sexual abuse or harassment. | N/A<br><br>No Step II appeal. | N/A |
| MBP-21-05-472-12B3<br><br>(ECF No. 35-3, PageID.239-243.) | Harris and Hares | QMHP Harris has been providing inadequate mental health care.  On April 28, 2021 and April 30, 2021, Jessie tried to get CHMS Hares to change Jessie's provider, but Hares only set up a meeting with Harris and Jessie.  After the meeting QMHP Harris told Jessie that if he needed any favors in the future he would have to perform oral sex on Harris. Other inmates overheard and made fun of Jessie.  This event is part of a pattern of deliberate indifference by Harris and Hares. | Rejected for including multiple issues. | Denied. | Rejected for failing to attempt to resolve the issue with staff before filing a grievance. |
| MBP-21-03-320-12B3<br><br>(Id., PageID.253-256.) | Harris and Hares | On January 13, 2021, Jessie attempted suicide by cutting an artery.  He was sent to Marquette General Hospital and was ultimately charged $3,913,79 for medical care. QMHP Harris was deliberately indifferent when he failed to evaluate Jessie as mentally ill at the time of the attempt despite Jessie's history of blacking out and attempting suicide.  As a result, Jessie is stuck with unreasonable hospital bills. | Rejected as duplicative of MBP-21-03-321-13B3. | Rejected as untimely. | Step II rejection upheld. |

| Grievance No. | Defendants Named | Allegation | Step I Response | Step II Response | Step III Response |
|---|---|---|---|---|---|
| MBP-21-10-1362-7Z<br><br>(*Id.*, PageID.232-235.) | Hares | Jessie's misconduct hearing investigator never completed a misconduct sanction screening form with Jessie. CHSM Hares signed off on a misconduct sanction assessment without the screening form.  This violated Jessie's due process rights and the Mental Health Rights Act Code 258 of 1974. It also constitutes deliberate indifference and neglect. | Denied. | Denied. | Denied. |

The undersigned agrees with Defendants' position that there are no genuine issues of material fact with respect to grievances three of the four grievances listed above – MBP-20-05-330-6D-PREA, MBP-21-03-320-12B3, and MBP-21-10-1362-7Z – and that these grievances did not exhaust Jessie's claims against Defendants Harris and Hares.

First, although Jessie claims to have exhausted his sexual harassment claim against QMHP Harris through **MBP-20-05-33060-PREA**, Jessie does not allege, and the record does not reflect, that Jessie appealed MBP-20-05-33060-PREA through Step II of the PREA grievance process. (*See* ECF No. 35-6 (Affidavit of MBP Litigation Coordinator Jennifer Farley).)  At the time, MDOC Policy Directive 03.03.140 ¶ EE specifically required prisoners to appeal unfavorable responses through Step II of the PREA grievance process in order to exhaust their claims.  As such, MBP-20-05-33060-PREA did not serve to exhaust the PREA grievance process.

Second, turning to **MBP-21-03-320-12B3**, the undersigned reiterates that a prisoner must *properly* exhaust his administrative remedies, meaning that he must exhaust his administrative remedies in accordance with the MDOC's procedural

rules. *Jones*, 549 U.S. at 218-19.  Grievance <u>MBP-21-03-320-12B3</u> was rejected at

Steps II and III because Jessie did not appeal the Step I grievance response within

the time provided by MDOC Policy Directive 03.02.130.  There are no genuine issues

of fact as to whether Jessie in fact appealed grievance <u>MBP-21-03-320-12B3</u> in a

timely manner.  As such, <u>MBP-21-03-320-12B3</u> did not serve to exhaust the MDOC's

grievance process.

Third,  turning  to  grievance  **<u>MBP-21-10-1362-7Z</u>**,  the  undersigned

acknowledges that the grievance was considered on its merits and denied at all three

steps of the grievance process.  Therefore, grievance <u>MBP-21-10-1362-7Z</u> served to

exhaust the grievance process.  However, it did not relate to Jessie's present claims.

Grievance <u>MBP-21-10-1362-7Z</u> reads as follows:

> H/I Hemmila never completed a Misconduct Sanction Screening form in
> my presence, a pre-requisite before a Misconduct Sanction Assessment
> is completed by a QMHP.  Mr. Hares the unit chief who isn't even my
> case manger signed the Sanction Assessment form CSJ-331 with no
> screening to build off of.  This was a manipulation of the assessment
> and screening process.  I was never interviewed.  I just received a screening
> form in the inst. mail that was blank in the Q and A section accompanied
> by a signature from Hemmila and another form CSJ-331 accompanied
> by a signature from Hares.  This violates my due process, a violation of
> the Mental Health Rights Act Code 258 of 1974.  This is also neglect and
> deliberate indifference which I should be protected from per the Mental
> Health Rights Act Code 258 of 1974.  I'd like H/I Hemmila be made [sic]
> to produce his copy of the CSJ-331 form that I was supposed to be
> screened with for evidence to substantiate my claim.  And for Mr. Hares
> to be made to answer—what documents motivated his assessment
> absent of a proper screening?

(ECF No. 35-3, PageID.234.)

In the opinion of the undersigned, <u>MBP-21-10-1362-7Z</u> did not put the MDOC

on notice of Jessie's claim that Defendants Harris and Hares provided Jessie with

inadequate mental health care in deliberate indifference to his serious mental health needs, or that Harris sexually harassed Jessie. Although Jessie uses the term "deliberate indifference" in this grievance, his complaint is that Hares completed a Misconduct Sanction Assessment without receiving a Misconduct Sanction Screening Form from a non-defendant hearings investigator. The grievance says nothing of Jessie's mental health treatment or lack thereof.

Although it is the undersigned's opinion that there are no genuine issues of material fact with respect to the aforementioned grievances, and that they did not serve to exhaust Jessie's claims, grievance **MBP-21-05-472-12B3** is a different story. That grievance reads as follows:

> Since I've come to MBP I've been perturbed by the level of treatment I've received from my QMHP Mr. Harris so I've been writing grievances on the matter and trying to appeal to the Unit Chief several times (the last dates being 4-28-21 and 4-30-21) to swap or switch me to another caseload because of the mental anguish that was being caused by Mr. Harris'[s] deliberate indifference and sexual inuendos [sic], that it aided in my wanting to kill myself (which as a result I've tried) and increased the times when I hear voices (I hear them the most when I have feelings of hopelessness). The only thing Mr. Hares has done was mediating a meeting between me and my QMHP to find a solution. At the first meeting Hares stated that he didn't believe me on the allegations against psych Harris and when he left and was out of earshot he told me (Harris that is) I was a crybaby and that if I needed any favors in the future I'd have to eat his penis for it. He said it out loud and I got teased by my peer until I tried to end my life. I told Mr. Hares and he said I was lying. My reason for bringing that up is solely to list a pattern of deliberate indifference and not to grieve about the first meeting Hares mediated, but to grieve the fact that after I once again explained the course of past events up to current events, Mr. Hares did nothing, even called me a liar to my face 4-30-21, during yet another mediated meeting including me, Harris, and Hares, once again leaving me distraught. I, at this meeting, told Harris [sic] that Mr. Harris told me that he doesn't believe I hear voices, cell[-]side, while on observation for a self-inflict[ed] injury suicide attempt. I explained that I no longer trust Harris because

he's bias[ed] and partial to my woes and condition as mentally ill and he refuses to put me on someone else's caseload so I can receive the treatment I deserve.  For this reason I apply the deliberate indifference standard.  According to the Mental Health Code Public Act 258 of 1974: 330.1722 sec.722(1) A recipient of mental health services shall not be subject to abuse or "neglect." 333.1713 sec. 713 states that a recipient shall be given a choice of physician or other mental health professional in accordance with the policies of the community mental health service program, licensed hospital, or service provider under contact with the community mental health service program.  I let Hares know 4-30-21 that I'm sure I'll successfully kill myself at some point if I'm forced to endure sexual advances and neglect.  I'm afraid of retaliation from this grievance.

(ECF No. 35-3, PageID.241.)  The Step I, Step II, and Step III responses to grievance

MBP-21-05-472-12B3 are shown below:

16

MICHIGAN DEPARTMENT OF
CORRECTIONS

CSJ-247S – DRAFT 6/28/2018

## STEP I GRIEVANCE RESPONSE SUPPLEMENTAL FORM

| Grievance #: | MBP-10-05-0047-212B3 | Prisoner Interviewed: | YES ☒ | IF NO, GIVE REASON: | |
|---|---|---|---|---|---|
| Prisoner Name: | Jessie | | NO ☐ | | |
| Prisoner #: | 701078 | | | | |

| Lock/Location: | | Extension Granted: | | | |
|---|---|---|---|---|---|
| | | YES: ☐ | NO: ☐ | If "YES" end date: | |

**COMPLAINT SUMMARY:**
Briefly summarize singular issue for which prisoner is requesting relief. If no relief sought, multiple issues/reliefs requested, evidence exists prisoner did not attempt to resolve, or if a duplicate or untimely, return to GC w/ reasons for rejection.

Inmate complains about the "level of care" received from his QMHP.  He brings other issues relative to PREA greivances as well.  He states his only reason for his greivance is to document a "pattein".  Since multiple issues are addressed in the body of his greivance, the inmate's greivance is rejected.

**INVESTIGATION SUMMARY:**
Briefly summarize investigation and findings including all documents reviewed. If an interview(s) conducted, enter dates/names/findings in this section. Inmate was interviewed on 5-6-2021.  The EMR was reviewed and the QMHP, Mr. Harris, LMSW, interviewed the same date.  All indications in the EMR are that the inmate has been seen in excess of stated policy for his level of care, OPT.  The inmate recieves the highest level of care at his current facility.  Higher level of care, RTP, is under consideration and dependent upon the inmate's adjustment in his behavior in order to make him a suitable candidate for a higher level of care at a lower custody level.  Inmate conitnues, per documentation in the EMR, to be resistant to proposed treatment and frequently fails to engage in discussion of his treatment plan goals.  His resistance makes him a poor candidate for RTP. Inmate is receiving ongoing clinical evaluations with disposition clinically appropriate, supported by his treatment team consisting of his qualified QMHP, board certified psychiatrist and professionally licensed unit chief.  The only evidence of impropriety is what the inmate has alleged and is unsubstantiated.

**APPLICABLE POLICY, PROCEDURE, ETC.:**
Enter relevant PD/OP number and name or Guideline/Protol reference; use paragraph reference when possible.  Do Not cut/paste large sections of text.
.PD 04.06.180; OP 04.06.183C, PD 04.06.182

**DECISION SUMMARY:**
Summarize decision based on investigation/findings.  Do not copy/paste large sections of PD/OP.  Bring to a conclusion to support partially resolved, resolved, or denied finding. Use the pronoun "you" to personalize to prisoner.

The inmate's greivance is rejected due to the his inclusion of multiple issues.  Each issues is unsubstantiated and would be denied if filed individually as noted above.

| As reported on CSJ-247A Step I Prisoner/Parolee Grievance Form: | | RESOLVED: ☐ | PARTIALLY RESOLVED: ☐ | DENIED: ☒ |
|---|---|---|---|---|
| **RESPONDENT NAME:** | R. Bailey-webb, LMSW | | **TITLE:** | P-11 |
| **RESPONDENT SIGNATURE:** | Bailey-webb, LMSW | | **DATE:** | 5/6/21 |
| **REVIEWER NAME:** | M. Hayes, LLP | | **TITLE:** | CHSM-2 |
| **REVIEWER SIGNATURE:** | Hayes MJ LLP | | **DATE:** | 5/6/21 |

Distribution: Original – Step I Grievance Coordinator     Copies – 2 To Grievant

Ex. 2

(*Id.*, PageID.243.)

## MICHIGAN DEPARTMENT OF CORRECTIONS

### Step II Grievance Appeal Response

| | |
|---|---|
| **Grievance Number:** | MBP21050047212B |
| **Prisoner Name:** | Jessie |
| **Prisoner Number:** | 701078 |

**SUMMARY OF STEP II REASON FOR APPEAL:**

*Prisoner claims he is not being given proper mental health treatment.   Claims 'deliberate inderrerence…"*

**CONCLUSION:**

I have reviewed your Step I Grievance, the Step I Response, and your Step II Reason for Appeal.

The prisoner claims he is not receiving proper treatment for his mental health disorder.

The prisoner is being seen regularly per policy for his mental health concerns by Mental Health Services Qualified Mental Health Professionals.  There is nothing to indicate he needs further services currently.  A review of the electronic medical record shows prisoner is being seen and treated in accordance with Health Services policy PD 03.04.100 and Mental Health Services policy PD 04.06.180.  His mental health needs are being met in his current environment and level of care by the Mental Health Services staff.  The treatment provided by the MHS professionals is within the scope of their professional training, education, and licensure as a Qualified Mental Health Professional by the State of Michigan and the MDOC.

A disagreement with the judgment of the qualified mental health provider does not support an allegation of denial of care or inappropriate care.  The record does not support allegations of retaliation or unprofessional conduct.

There has been no violation of MDOC policy.  Grievance denied.

Prisoner is advised to follow the treatment recommendations of mental health staff.  He may contact mental health staff to discuss his care and concerns further as necessary.

| **RESPONDENT NAME:** | **TITLE:** |
|---|---|
| Tom Osier, M.A. | Asst. Mental Health Services Director |
| **RESPONDENT SIGNATURE:** | **DATE:** |
| *Thomas J. Osier* | 6/8/2021 |

(*Id.*, PageID.240.)

18

**Step III Grievance Response**

MYRON JESSIE                    701078

MBP      21050472

Grievant alleges unprofessional behavior by the Qualified Mental Health Professional; claims his mental health needs are not being appropriately addressed.

In accordance with PD 03.02.130, this grievance is rejected as failed to attempt to resolve issue with staff.  Per the Electronic Medical Record, a written attempt to resolve this issue through a Health Care Request (CHJ-549)/Prisoner Kite for medical services was not found in the EMR.

The grievance tracking number has been changed from MBP-21-05-0472-12B3 to MBP-21-05-0472-28i in order to reflect the grievance category code at Step III.

Grievance rejected.

Response of  Bureau of Health Care Services                    Date:      6/28/2021

Approved: _____                    Date: _____7/15/2021___
                    S. Smoyer, RN

_RD Russell_____                    :    MAILED JUL 19 2021
Richard D. Russell  Manager, Grievance Section Office of Legal Affairs          _____
                                                                                                              Date Mailed

Ref. #          31774

C:      Warden   MBP

          Regional Health Care Administrator          Northern
          Grievant

(*Id.*, PageID.238.)

Defendants argue that there are no genuine issues of material fact and that this grievance did not properly exhaust the MDOC's grievance process because it was rejected at Steps I and III.  (ECF No. 35, PageID.198.)  Furthermore, Defendants posit that Jessie could only exhaust his sexual harassment claim through the PREA grievance process.  (*Id.*, PageID.197.)  The undersigned disagrees.

Turning first to the issue of "proper exhaustion," the undersigned finds that there are genuine issues of material fact bearing on whether the MDOC waived the procedural defects in grievance MBP-21-05-472-12B3.  As explained above, prison

19

officials waive enforcement of their procedural rules when they consider the merits of a grievance despite its defects. *Reed-Bey*, 603 F.3d at 325. Although grievance MBP-21-05-472-12B3 was rejected because it contained multiple issues at Step I, it was denied on its merits at Step II.[5] A reasonable finder of fact could determine that this merits-based decision waived any pre-existing procedural defects.[6] *See Raper v. Controneo*, 2018 WL 2928188, at *3 (W.D. Mich., June 12, 2018) (finding that a grievance rejected for the first time at Step III based on a pre-existing procedural defect exhausted the claims stated within); *McBride v. Canlas*, No. 2:20-CV-212, 2021 WL 5332408 (W.D. Mich. Oct. 8, 2021) (same), *R&R adopted*, No. 2:20-CV-212, 2021 WL 5323769 (W.D. Mich. Nov. 16, 2021); *Sedore v. Greiner*, 2020 WL 8837441, at *7 (E.D. Mich. Sept. 21, 2020) ("As a matter of policy, it would be unfair to allow prison officials to address the merits of a prisoner's grievance, but then reject the grievance for a procedural error that existed throughout the process at the final step, where the prison official has the last word.").

Moreover, there are genuine issues of material fact as to whether Jessie's grievance was properly rejected at Steps I and III. Although grievance MBP-21-05-472-12B3 was rejected because it contained multiple issues, MDOC Policy Directive 03.02.130 does not prohibit prisoners from filing grievances concerning multiple

---

[5]    It is also worth noting that despite the fact that grievance MBP-21-05-472-12B3 was rejected at Step I, the Step I Respondent clearly determined that Jessie's complaints lacked merit.

[6]    Including Jessie's failure to attempt resolution of his claims prior to filing the grievance, which served as the basis for the Step III rejection of grievance MBP-21-05-472-12B3.

issues.  Instead, it prohibits prisoners from filing grievances concerning multiple *unrelated* issues.  MDOC Policy Directive 03.02.130 ¶ J(1).  *See McDuff v. Addis*, No. 1:17-CV-912, 2018 WL 3239491, at *3-4 (W.D. Mich. July 3, 2018) (finding that a grievance complaining about four related events was improperly rejected as concerning multiple unrelated issues).

In the opinion of the undersigned, a reasonable finder of fact could determine that to the extent grievance MBP-21-05-472-12B3 contained multiple issues, those issues were related, and the Step I rejection was therefore improper.  *See Wilson v. Taskila*, No. 2:21-CV-236, 2022 WL 16745768, at *5 (W.D. Mich. Sept. 20, 2022) (citing *McDuff*, 2018 WL 3239491, at *4) ("[W]hen the MDOC improperly rejects a grievance as concerning multiple unrelated issues, it renders the grievance process unavailable with respect to the claims therein."), *R&R adopted*, No. 2:21-CV-236, 2022 WL 16744819 (W.D. Mich. Nov. 7, 2022).

Similarly, grievance MBP-21-05-472-12B3 was rejected at Step III of the grievance process because the Respondent could not locate a "written attempt to resolve [Jessie's] issue through a Health Care Request (CHJ-549)/Prisoner Kite."  The portion of grievance MBP-21-05-472-12B3 addressing Jessie's attempts to resolve his complaint prior to filing MBP-21-05-472-12B3 is shown below.

What attempt did you make to resolve this issue prior to writing this grievance? On what date? 4-28-21 & 4-30-21
If none, explain why. Ive written grievances on the matter. Ive tried to sympathize with Unit Chief Hares and QMPH Harris about taking matters seriously. Ive written Health Care kites, written Activists on the outside, tried years of patience and tried appealing to Dr. Meaden (Head Psychiatrist), and prayed to no avail.

(ECF No. 35-3, PageID.241.)  While Jessie said that he had written kites on the issue, he also implied that he had spoken with Hares and Harris about the matters

contained in his grievance.  MDOC Policy Directive 03.02.130 ¶ Q provides that: "Prior to submitting a written grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue."  Nowhere does the policy say that a prisoner must attempt to resolve the issue in writing or through a health care request.  Accordingly, in the undersigned's opinion, a reasonable finder of fact could determine that the Step III rejection was improper.

Ultimately, the undersigned finds that there are genuine issues of material fact bearing on whether grievance MBP-21-05-472-12B3 exhausted the MDOC's grievance procedure with respect to his claims against Defendants Harris and Hares. This includes Jessie's claim that QMHP Harris sexually harassed him.  Although Defendants argue that the PREA grievance process was the appropriate administrative remedy to exhaust Jessie's sexual harassment claim, MDOC Policy Directive 03.03.140 ¶ EE (effective Apr. 24, 2017, superseded Apr. 5, 2021) provides that the PREA grievance process "is a two-step process allowing prisoners to grieve regarding allegations of sexual *abuse.*"  *Id.* at ¶ EE (emphasis added).  And Policy Directive 03.03.140 repeatedly distinguishes between sexual abuse and sexual harassment.  *See id.* at ¶¶ D-E, G, V.  Indeed, when the MDOC updated the policy directive, it specified that: "Prisoners may utilize the prisoner grievance system in accordance with PD 03.02.130 'Prisoner/Parolee Grievances' to report allegations of sexual harassment or retaliation."  MDOC Policy Directive 03.03.140 ¶ WW (effective Apr. 5, 2021).  Furthermore, it appears that both the Step I Respondent and the Step

II Respondent to grievance <u>MBP-21-05-472-12B3</u> specifically considered the merits of Jessie's claim that QMHP Harris had made sexually harassing comments to Jessie. (ECF No. 35-3, PageID.243 ("The only evidence of impropriety is what the inmate has alleged and is unsubstantiated."); *id.*, at PageID.240 ("The record does not support allegations of retaliation or unprofessional conduct.").) Accordingly, the undersigned concludes that there are genuine issues of material fact precluding summary judgment as to all of Jessie's claims against Defendants Harris and Hares.

## VI.     Recommendation

The undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment based on Jessie's failure to exhaust his administrative remedies.  In the opinion of the undersigned, there are genuine issues of material fact bearing on whether grievance <u>MBP-21-05-472-12B3</u> was sufficient to exhaust Jessie's deliberate indifference claims against Harris and Hares.

If the Court accepts this recommendation, all of Jessie's claims will remain.

Dated:   April 20, 2023                                          /s/ *Maarten Vermaat*
                                                                                   MAARTEN VERMAAT
                                                                                   U. S. MAGISTRATE JUDGE

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).