UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MYRON JESSIE, #701078,                          Case No. 2:22-cv-54

                    Plaintiff,                  Hon. Paul L. Maloney
                                                U.S. District Judge

            v.

MARK HARRIS, et al,

                    Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses motions for summary judgment filed by the three remaining Defendants.  (ECF No. 71 (motion by Defendant Hares and Harris), ECF No. 76 (motion by Defendant Boudreau).)

Plaintiff — Myron Jessie — filed his complaint on March 16, 2022, alleging that Defendants — Mark Hares, Larry Harris[1], and Anthony Boudreau — violated his Eighth Amendment rights during his confinement at Marquette Branch Prison (MBP) in Marquette, Michigan.  (ECF No. 1.)  In his verified complaint, Jessie asserted that, during his incarceration at MBP, members of his mental health team

---

[1]    The undersigned notes that Larry Harris is referred to as Mark Harris on the docket and in Boudreau's motion for summary judgment.  However, the Defendant's real name is Larry Harris.

1

violated his rights under the Eighth Amendment as well as various state laws[2] and policies of the Michigan Department of Corrections (MDOC).  (ECF No. 1, PageID.11-13.)  More specifically, Jessie alleges that Defendants provided him with inadequate mental health care and that Defendant Harris sexually harassed him.  (ECF No. 1, PageID.3-8.)

On October 3, 2022, the Court dismissed all but the following claims:

(1) Jessie's Eighth Amendment claims against Defendant Harris for verbal and sexual harassment,

(2) Jessie's Eighth Amendment claims against Defendants for failing to provide appropriate mental health care, and

(3)  Jessie's state law claims.

(ECF Nos. 14, 15.)

On February 28, 2023, Defendants Hares and Harris filed a motion for summary judgment, asserting that Jessie did not fully exhaust his administrative remedies prior to filing suit.  (ECF No. 34.)  The Court denied that motion, because there were genuine issues of material fact as to whether Jessie properly went through the entire grievance process.  (ECF Nos. 41, 44.)

Defendants now move for summary judgment.  (ECF Nos. 71, 76.)  Defendants Harris and Hares argue that Jessie cannot support his Eighth Amendment claims that they were deliberately indifferent to Jessie's medical needs.  Further, Harris and

---

[2]    His state law claims include negligence, intentional infliction of emotional distress, medical malpractice, and violations of the Mental Health Code Act 258 of 1974.

Hares argue that that they are entitled to qualified immunity.  Finally, Harris and Hares argue that the Court should decline to exercise supplemental jurisdiction over the state law claims.  (ECF No. 72, PageID.400.)  Defendant Boudreau argues that he did not act with deliberate indifference to Jessie's serious medical needs.  (ECF No. 77, PageID.799-801.)  Further, Defendant Boudreau argues that Jessie's state law claims should be dismissed because they fail as a matter of law.  (*Id.*, PageID.801.)

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment.  In the undersigned's opinion, there are no genuine issues of material fact remaining.  The record establishes that Jessie continued to receive mental health care from Defendants, and that Jessie disagrees with Defendants' methods of treatment.  Thus, the record fails to support Jessie's Eighth Amendment claim.  Further, Jessie's sexual harassment claim based solely on verbal harassment fails to support an Eighth Amendment violation.  Finally, the Court should decline supplemental jurisdiction over the State law claims.  For the reasons discussed below, the undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment.

## II. Facts

### a. Jessie's Factual Allegations

Jessie says that he first started seeing Qualified Mental Health Professional (QMHP) Harris in late summer of 2017. (ECF No. 1, PageID.4.) During a group meeting, Harris asked if anyone had anything to share or any questions to ask. Jessie

says that when he started talking about his treatment, Harris "shut him down" and said that he did not care. Jessie says that he blacked out and kicked a chair, leading QMHP Harris to issue Jessie a misconduct ticket. (*Id*.) Jessie says that although he attempted to have Harris take his mental health needs seriously, this incident began Harris's pattern of disregard for Jessie's mental health needs.

Jessie says that at some point before May 20, 2020, he politely asked QMHP Harris to remove himself from Jessie's case because Jessie believed that Harris was deliberately indifferent to his needs. (*Id*., PageID.5.) Jessie says that Harris refused to believe most of what Jessie told him during their appointments, which led Jessie to become suicidal. (*Id*.)

Jessie says that on May 20, 2020, he met with QMHP Harris and Community Health Services Manager (CHSM) Hares.  Jessie says that when Hares was out of earshot, Harris called Jessie a crybaby and told Jessie that if he needed favors going forward, Jessie would have to perform oral sex on him. (*Id*.) Jessie believes that Harris made this statement because Jessie had previously informed Harris that he is bisexual.

Jessie says that he tried to tell CHSM Hares about Harris's remark, but Hares dismissed Jessie's claim as a lie. Jessie says that this caused him to experience a "downward spiral." (*Id*.)

According to Jessie, he became suicidal after other inmates began to taunt and tease him for his sexuality.  He says that he began blacking out and attempting suicide during those blackouts. (*Id*.) Jessie says that he heard louder and more

persistent voices in his head that told him to hurt himself and others. Jessie says that on at least one occasion, he was sent to the emergency room for a blood transfusion after he attempted suicide. (*Id.*, PageID.6.) Even still, Jessie says that he received essentially no treatment from QMHP Harris. (*Id.*) And Jessie alleges that CHSM Hares went so far as to forge mental health documents. (*Id.*, PageID.8.)

In addition to his complaints against Harris and Hares, Jessie says that his psychiatrist, Defendant Boudreau, failed to diagnose him with a major mental disorder. (*Id.*, PageID.7.) Jessie says that a major mental disorder diagnosis would have made him eligible for other types of treatments and programs. (*Id.*)

### b. Medical Record

Jessie has a lengthy medical record starting in 2017. (ECF No. 72-6.) Psychologist Erika Lobdell examined Jessie in June of 2017, and noted that Jessie was acting out and that his behavior might have "secondary gain" attached (meaning, Jessie's behavior or misbehavior did not solve his problems but might trigger other benefits, such as increased attention). (*Id.*, PageID.444.) Further, Lobdell noted Jessie's claims of mental health issues seem to be a way for him to absolve himself of responsibility for his actions. (*Id.*, PageID.445.) Reports of Jessie's mental state from this time indicate that he was not suicidal, homicidal, or psychotic. (*Id.*, PageID.448.) Jessie was then transferred to MBP, where he began seeing Defendants for mental health care.

### i. History with Boudreau

The records provided by the parties document treatment by Boudreau from July 2017 through August 2022. Jessie first saw Boudreau on July 19, 2017. Boudreau noted that Jessie appeared to suffer from bipolar disorder with psychotic features and ADHD. (ECF No. 77-3, PageID.824.) Accordingly, Boudreau adjusted Jessie's medication based on Jessie's subjective complaints. (*Id.*, PageID.825.) Between July and December, Jessie saw Boudreau several more times for medication review assessments with no-shows by Jessie in October of 2017. (*Id.*, PageID.827-837.) During a follow up examination on December 28, 2017, Boudreau determined that Jessie did not exhibit any increased suicide risk. (*Id.*, PageID.838.) Due to Jessie's concerns with weight gain, Boudreau changed Jessie's medications. (*Id.*, PageID.840.)

On February 23, 2018, Boudreau noted that Jessie does not appear to be inattentive or hyperactive, despite his bipolar disorder and ADHD. (*Id*, PageID.845.) Jessie inquired about a drug that his neighbor was taking, and Boudreau noted that he would continue to monitor Jessie for seeking medication. (*Id.*) Boudreau further noted that Jessie exhibited no evidence of paranoia. (*Id.*)

Jessie missed his follow-up appointment for medication review on May 2, 2018. (*Id.*, PageID.846.) Jessie next saw Boudreau on June 15, 2018. (*Id.*, PageID.848.) At that appointment, Boudreau noted that Jessie described his mood as "depressed" but denied thoughts of self-harm or psychotic symptoms. (*Id.*, PageID.846, 850.) Again, Boudreau switched Jessie's medications in response to his complaints. (*Id.*) On June

6

26, 2018, Jessie was found with approximately 15 pills in his possession in a possible overdose attempt or medication diversion. (*Id.*, PageID.852-853.)   As a result, Boudreau ordered Jessie's pills to be dissolved in water.  (*Id.*)

Jessie visited Boudreau on July 12, 2018, for a medication review appointment. (*Id.*, PageID.854.)   Jessie reported experiencing numerous stressors and difficulty coping with his current situation.   (*Id.*)   Jessie felt that he was experiencing posttraumatic stress symptoms again, noting that he had lost contact with his son and family, and expressed worries about his health.  (*Id.*)   Boudreau increased medication to combat Jessie's mood and sleep issues.  (*Id.*)   Boudreau noted that Jessie's medication use should be monitored due to the June 26 incident.  (*Id.*)

On August 15, 2018, Boudreau discussed Jessie's status with Jessie's case manager and medication provider but performed no evaluation of Jessie.  (*Id.*, PageID.858.)   Boudreau noted Jessie's recent complaints about side effects from one of his medications, noting that Jessie describes the side effect as "bugs on his skin crawling."   (*Id.*)   Accordingly, Boudreau decreased the medication but did not discontinue its use to prevent any withdrawal symptoms.  (*Id.*)

On August 28, 2018, Jessie visited Boudreau with his case manager.  (*Id.*, PageID.860.)   Jessie spent most of the time discussing past trauma and psychiatric symptoms.  (*Id.*)   During the meeting, Boudreau noted that Jessie utilizes a lot of antisocial projection.  (*Id.*)   Boudreau recommended several medications, but Jessie insisted on trying Wellbutrin.  (*Id.*)   Jessie also described some of his psychosis symptoms, including seeing visual hallucinations, spiders, and hearing his

7

grandmother speak to him.  (*Id.*)  Boudreau reported that it was difficult to determine if Jessie was exaggerating his symptoms.  (*Id.*, PageID.862.)

On October 26, 2018, Jessie visited Boudreau for another medication review. (*Id.*, PageID.869.)  At that time, Jessie discussed his daily stressors, mostly centered around issues in his family life.  (*Id.*)  Jessie remarked that he was unable to tolerate his current antidepressants.  (*Id.*)  Accordingly, Boudreau submitted a request for Wellbutrin, which Jessie had previously requested.  (*Id.*, PageID.871.)  Further, Boudreau decided that Jessie should be referred to a Residential Treatment Program (RTP).  (*Id.*, PageID.869.)

Jessie next saw Boudreau on November 13, 2018, for another medication review assessment.  (*Id.*, PageID.873.)  Jessie reported that his mood and concentration had improved since taking Wellbutrin.  (*Id.*)  Jessie also reported that he would continue to focus on his RTP.  (*Id.*)  Boudreau noted that Jessie denied reporting any psychotic symptoms and that Jessie's sleep and appetite appeared stable.  (*Id.*, PageID.875.)

On January 15, 2019, Jessie visited Boudreau for a medication review assessment.  (*Id.*, PageID.876.)  Jessie complained of past trauma and desired to have more trauma-focused treatment.  (*Id.*, PageID.878.)  Boudreau described Jessie's mood as easy to change, noting that Jessie had a positive outlook on a new job placement, but then became pessimistic about his prospects for success.  (*Id.*, PageID.876.)  Jessie stated that he felt paranoid and claimed that he was seeing shadows.  (*Id.*)  Boudreau believed that this paranoia was likely not psychotic-based.

(*Id.*)  Boudreau continued Jessie's treatment on Wellbutrin and other medications and noted that Jessie exhibited no signs of psychosis.  (*Id.*, PageID.878.)

Two months later, Jessie visited Boudreau for a medication review assessment on March 13, 2019.  (*Id.*, PageID.882.)  Boudreau reported that Jessie's current medications were effective without side effects.  (*Id.*)  Jessie continued to exhibit problems regarding past stressors and trauma issues, but Boudreau noted that it appeared that Jessie was working on them through his treatment plans.  (*Id.*)  Boudreau did note past self-interested behavior by Jessie.  (*Id.*)

On May 1, 2019, Jessie was transferred to the Gus Harrison Correctional Facility (ARF) for RTP.  (*Id.*, PageID.888.)  On November 25, 2019, Jessie was transferred back to MBP due to misconduct and poor relationships with the treatment teams at ARF.  (*Id.*, PageID.892.)

After transferring back to MBP, Jessie visited Boudreau for a psychiatric evaluation on December 3, 2019.  (*Id.*, PageID.897.)  Boudreau noted that Jessie did not exhibit any psychiatric symptoms while off his medications.  (*Id.*)  Further, at ARF, Jessie did not display any self-injurious behavior and was successful in managing his symptoms of depression.  (*Id.*)  Boudreau further reported that Jessie has a history of trauma and regresses in response to his environment.  (*Id.*, PageID.898-899.)  In Boudreau's opinion, Jessie did not meet the criteria for bipolar disorder but he showed signs and symptoms of depression and PTSD.  (*Id.*)  Boudreau diagnosed Jessie with depression, PSTD, polysubstance dependence, and ASPD and began medicating Jessie for these issues.  (*Id.*)

During several 2020 visits with Jessie, Boudreau noted that Jessie frequently used aggression and manipulation during their meetings.  For example, on February 25, 2020, Boudreau noted that Jessie exhibited anger about his recent discharge from RTP.  (*Id.*, PageID.900.)  During the that visit, Jessie commented to his case manager, "it is a good thing that I don't hate you because I would assault you."  (*Id.*)  On April 20, 2020, Jessie remarked that he would have no difficulty harming others if his situation worsened.  (*Id.*, PageID.902.)  During that visit, Jessie seemed focused on receiving a major diagnosis, because he believed he would receive better treatment. (*Id.*)  On June 29, 2020, Jessie made threats of acting out to get higher levels of service (*Id.*, PageID.904.)   On September 8, 2020, Jessie made several manipulative comments  (*Id.*, PageID.907.)  During that visit, Jessie admitted to feeling angry and impulsive at times.  (*Id.*)  Despite Jessie's repeated aggression, Boudreau worked with Jessie to find appropriate medications to address Jessie's mental health needs.

On September 21, 2020, Jessie was placed in segregation where he was evaluated by other providers.  (*Id.*, PageID.906.)  During his first week of segregation, Jessie did not complain of any mental health issues.  (*Id.*)  Jessie was again evaluated on October 23, 2020, by another provider.  (*Id.*, PageID.910.)  Jessie stated that he was writing grievances because he intended to sue the MDOC to get money for his son.  (*Id.*)  The evaluator further reported that Jessie knows "right from wrong," is capable of following rules and expectations, and presents no evidence of suicidal risk or thoughts of hurting others.  (*Id.*)

On December 4, 2020, Boudreau saw Jessie for a status report. (*Id.*,
PageID.912.) Boudreau reported that Jessie did not appear to be in distress, but
easily escalated over being in segregation. (*Id.*) Boudreau further observed that
Jessie remained reactive and impulsive. (*Id.*) Boudreau decided to further increase
Jessie's medication. (*Id.*) On December 8, 2020, Boudreau responded to Jessie's kite
request asking for medication to help his mood and sleep. (*Id.*, PageID.911.)
Boudreau, after discussing with Jessie's case manager, ordered a low dose of the
requested medication. (*Id.*)

On February 25, 2021, while Jessie was still in segregation, Boudreau visited
Jessie. (*Id.*, PageID.915.) Boudreau reported that Jessie's thoughts remained
organized, and Boudreau found no evidence of psychosis or mania. (*Id.*) Boudreau
further noted that Jessie responded well to his medications but asked for Wellbutrin
again. (*Id.*) Boudreau stated that Jessie had a history of having Wellbutrin
discontinued due to diversion. (*Id.*) Although Jessie claimed he was experiencing
side effects from his current medication, Boudreau could not confirm any side effects,
and Jessie became angry when questioned. (*Id.*) Boudreau created a plan for Jessie
to continue his medications and to consult with the psychiatrist at MBP. (*Id.*)

On April 21, 2021, Boudreau visited Jessie while he was in an observation cell.
(*Id.*, PageID.918.) Jessie had been placed in his observation cell because of his
inability to cope with segregation. Boudreau reported that Jessie had inconsistent
views of his medication as Jessie indicated that he thought they were not working.
(*Id.*) Boudreau attempted to discuss different options but was cut short by Jessie.

11

(*Id.*)  Boudreau further opined that Jessie was difficult to assess due to his agitated and oppositional presentation.    (*Id.*)    To conclude the meeting, Boudreau recommended that Jessie continue to work on positive coping skills for his future assessment with the MBP psychiatrist.  (*Id.*)

On May 3, 2021, the MBP psychiatrist, Terry Meden, saw Jessie.  (*Id.*, PageID.920.)  During his visit, Jessie complained of numerous diagnosis changes, but Dr. Meden noted that Jessie's diagnoses had been stable.  (*Id.*)  Dr. Meden told Jessie that his primary diagnosis is antisocial personality disorder (ASPD) and that he agreed with the current diagnosis.  (*Id.*)  Jessie indicated that he was hearing voices, and that is why he asked for the medication Geodon.  (*Id.*)  Dr. Meden asked Jessie for more details about the "voices" and Jessie stated that he hears random voices, and sometimes his grandmother.  Upon further questioning, Jessie said "just forget it. Take me off all my meds.  I don't want my meds."  (*Id.*)

Jessie next saw Boudreau on May 12, 2021, to discuss appropriate treatments in lieu of Jessie's request to terminate his medication.  (*Id.*, PageID.922.)  Boudreau noted that Jessie became defensive and argumentative when Boudreau asked about plans to take medication.  (*Id.*)  Boudreau reported that he attempted to provide education about the purposes of Jessie's medications, but Jessie interrupted him and stated that he would "dress Boudreau out" or spit on him.  (*Id.*)  When discussing diagnoses, Jessie indicated that he wanted the medication Cogentin and not Geodon. (*Id.*)  Boudreau continued Jessie's treatment with Effexor due to the potential risk of withdrawal and its appropriateness for treating PTSD and depression.    (*Id.*,

PageID.923.)  Boudreau discontinued Jessie's treatment with Geodon.  (*Id.*)  At the end of his evaluation, Boudreau noted that he would consider other personality diagnoses and discuss them with the MBP psychiatrist.  (*Id.*)

On May 28, 2021, Boudreau discussed Jessie's lab results with Dr. Meden.  (*Id.*, PageID.925.)  Afterwards, Dr. Meden saw Jessie to discuss the lab results.  (*Id.*, PageID.926.)  During the visit, Jessie complained of side effects due to some of his medications being discontinued.  (*Id.*)  Dr. Meden suggested Zoloft as an effective antidepressant, but Jessie insisted on receiving Wellbutrin.  (*Id.*)  When Dr. Meden told Jessie that he would not prescribe Wellbutrin, Jessie became angry and threatened Dr. Meden.  (*Id.*)  Dr. Meden terminated the session thereafter.  (*Id.*)

On June 9, 2021, Boudreau visited Jessie again.  (*Id.*, PageID.930.)  Jessie focused on his health status and skin allergies during the visit rather than his mental health medication.  (*Id.*)  Boudreau noted that Jessie appeared less reactive and few of his personality traits were present.  (*Id.*)  Further, Boudreau opined that Jessie's PTSD appeared "managed."  (*Id.*)

Boudreau next saw Jessie on June 22, 2021, when Jessie was in observation. (*Id.*, PageID.932.)  Prior to being placed in observation, Jessie had smeared feces on his cell walls and broke a sprinkler head.  (*Id.*)  Jessie was placed in observation due to reports of self-harm and hunger-striking behavior.  (*Id.*)  Boudreau spoke with Jessie and reported that Jessie denied any current thoughts of self-harm. (*Id.*)  Jessie appeared focused on getting back on Wellbutrin but became angry when Boudreau reminded him of past diversion and threats made towards Dr. Meden.  (*Id.*)  At the

13

end of his report, Boudreau indicated that he planned to continue Jessie's current medication and would consider other options for antidepressants.  (*Id.*)

On July 30, 2021, Boudreau noted that Jessie appeared "grandiose and histrionic."  (*Id.*, PageID.934.)  Jessie continued to exhibit ASPD conduct and projection.  (*Id.*)  Boudreau further noted that "as usual, Jessie tends to project his feelings and attempts to get individuals to argue."  (*Id.*)  Further, throughout the evaluation, Jessie made statements about hurting others and at times made body movements to intimidate Boudreau.  (*Id.*) Boudreau changed Jessie's antidepressants to Paxil, upon  Jessie's request.  (*Id.*)  Boudreau was informed by custody staff that Jessie had been attempting to manipulate his neighbor.  (*Id.*)

On August 18, 2021, Jessie told Boudreau that Paxil was not working and made him feel tired and diminished his libido.  (*Id.*, PageID.936.)  Boudreau suggested changing the dose of Paxil, but Jessie opposed this alteration, so Boudreau suggested Prozac.  (*Id.*)  On September 15, 2021, Boudreau followed up with Jessie.  (*Id.*, PageID.938.)  The reason for the visit was that Jessie had been on a suicide management plan, hunger strike, and refused his medication.  (*Id.*)  Shortly before Boudreau's visit, Jessie had begun taking his Prozac again.  (*Id.*)  Boudreau suggested an increase in Prozac.  (*Id.*)  Boudreau reported that Jessie was not argumentative during the visit.  (*Id.*)

On October 15, 2021, Boudreau visited Jessie to discuss treatment.  (*Id.*, PageID.940.)  Boudreau noted that Jessie's personality disorder continued to dominate much of Jessie's interactions with staff.  (*Id.*)  Shortly before the visit,

14

Jessie had assaulted a custody staff member, and he believed his current treatment plan was retaliation for his assault.  (*Id.*)  During the visit, Jessie expressed frustration with custody staff, other inmates, and nursing staff, indicating that "shit is going to get serious."  (*Id.*)  Boudreau found that Jessie still exhibited no signs of mania, psychosis, or any increase in PTSD.  (*Id.*)

On November 24, 2021, Boudreau assessed Jessie in relation to a recent reduction in Prozac.  (*Id.*, PageID.942.)  Boudreau noted that Jessie's presentation appeared unchanged, and Jessie continued to exhibit extreme irritability on the edge of aggression.  (*Id.*)  Boudreau reviewed Jessie's medications with him, but Jessie seemed focused on getting back on Wellbutrin.  (*Id.*)  In his review, Boudreau noted that Jessie had less misconducts while on Wellbutrin and recommended restarting the medication for Jessie.  (*Id.*)  Boudreau next saw Jessie on December 20, 2021, for a follow up after restarting Wellbutrin.  (*Id.*, PageID.945.)  Boudreau reported that Jessie's mood seemed improved from the Wellbutrin and accordingly increased Jessie's Wellbutrin dosage.  (*Id.*)  During the visit, Boudreau noted that Jessie again showed signs of grandiosity but exhibited no evidence of mania or psychosis.  (*Id.*)  Additionally, Boudreau noted that since starting Wellbutrin again, Jessie appeared more motivated and less aggressive.  (*Id.*)

Boudreau did not see Jessie again until February 15, 2022, for a follow up regarding Jessie's Wellbutrin.  (*Id.*, PageID.947.)  Jessie reported that he experienced auditory hallucinations but did not go into detail.  (*Id.*)  Boudreau increased the Wellbutrin dosage after noting that Jessie's mood continued to show signs of

15

improvement from the medication. (*Id.*) Consistent with previous visits, Jessie denied any thoughts of self-harm and Boudreau found no evidence of mania or psychosis. (*Id.*)

On March 29, 2022, Jessie was transferred to RTP for mood swings. (*Id.*, PageID.949.) During his RTP, Jessie remained medication compliant and refrained from self-harming behaviors. (*Id.*) During RTP, Jessie reported that he was working on "four lawsuits" and had "secretaries" that would help him move around his money. (*Id.*) On May 15, 2022, Jessie was transferred from RTP, because the RTP caretakers believed Jessie was interfering with the treatment of others. (*Id.*)

Boudreau next saw Jessie on June 17, 2022. (*Id.*, PageID.951.) Boudreau again noted that Jessie responded well to the Wellbutrin. (*Id.*) However, Jessie indicated that he used to take other inmate's medications and therefore he could not take a mood stabilizer. (*Id.*) Again, Boudreau reported that Jessie continued to project his antisocial thinking onto others. (*Id.*)

On July 1, 2022, Boudreau performed a "Transfer in Assessment" on Jessie. (*Id.*, PageID.953.) This assessment consisted of a review of Jessie's medical history, relevant transfer documents, and Jessie's treatments from other facilities. (*Id.*) In this assessment, Boudreau noted that Jessie has suffered mental health difficulties since he was 17 years old, and Jessie had engaged in suicidal and self-injurious behavior while in prison, including cutting an artery and an attempted hanging. (*Id.*) Boudreau further noted that Jessie continued to have difficulty with authority, prison structure, and other inmates. (*Id.*) Boudreau opined that Jessie has limited insight

16

into his personality disorders and how to appropriately interact socially.  (*Id.*) Boudreau continued Jessie's treatment on Wellbutrin due the positive impacts on Jessie's mood.  (*Id.*, PageID.954.)

Boudreau next saw Jessie on August 11, 2022.  (*Id.*, PageID.956.)  Again, Jessie did not exhibit any signs of mania or psychosis and continued to do well on Wellbutrin.  (*Id.*)  Boudreau further noted that Jessie appeared to be motivated to move to a lower level and transfer out of MBP.  (*Id.*)  Boudreau ordered Wellbutrin to be continued for Jessie and scheduled a follow-up within 90 days or as needed.  (*Id.*)

### ii.  Case Management Records

The records before the Court document treatment by QMHP Harris from September 2017 through March 2022.  On September 28, 2017, Jessie first met with QMHP Harris.  (ECF No. 72-6, PageID.449.)  During the visit, Jessie expressed interest in RTP.  (*Id.*)  Harris discussed Jessie's behavior and cognitive tools to help Jessie regulate his anxiety.  (*Id.*)

Harris does not appear in Jessie's medical records again until an April 6, 2018 segregation visit.  (*Id.*, PageID.454.)  During that visit, Harris discussed with Jessie the possibility of going to Secure Status Outpatient Treatment Program (SSOTP) to receive therapy.  (*Id.*)  Jessie continued to express his desire and goal of getting to RTP for additional coping skills for his mental health troubles.  (*Id.*)

On May 10, 2018, Jessie began his group therapy with Harris.  (*Id.*, PageID.456.)  Harris reported positively on Jessie's interactions during the group therapy session.  (*Id.*)  Jessie showed a fair willingness to learn and help others learn,

new ways of thinking, behaving, and managing feelings.  (*Id.*)  Jessie participated in group discussions in active and meaningful ways by disclosing relevant personal information and providing appropriate feedback.  (*Id.*)  Harris concluded that Jessie showed signs of progress in learning material and attempting to further his prosocial change.  (*Id.*)  On May 24, 2018, during another visit, Harris recognized the progress Jessie had been making to address his mental health and conduct issues.  (*Id.*, PageID.458.)

On June 26, 2018, Harris evaluated Jessie's suicide risk after an alleged suicide attempt.  (*Id.*, PageID.460.)  Harris visited Jessie while he was in segregation but reported that Jessie minimally engaged with him.  (*Id.*)  Jessie was hard to understand during the visit and would not repeat himself.  (*Id.*)  Jessie had been issued a misconduct for the apparent overdose, but when Jessie was sent to the emergency department, lab results showed Jessie did not actually overdose.  (*Id.*, PageID.461.)  At the emergency department, Jessie was reported to have been joking with staff and other inmates.  (*Id.*)  Harris noted that this behavior is inconsistent with suicidal intent.  (*Id.*)

On June 28, 2018, Harris saw Jessie for a segregation visit.  (*Id.*, PageID.462.)  During the visit, Jessie listened to Harris for about 20 seconds and then proceeded to lay down with a blanket over his head, ignoring any further questions or attempts to engage.  (*Id.*)  Since the suicidal event, Jessie had been managing his safety but refused to cooperate with mental health providers.  (*Id.*)  Jessie expressed anger at

Harris for his alleged ineffective treatment. (*Id.*) Harris reported that Jessie's alleged overdose was to express further anger with mental health treatment. (*Id.*)

On August 7, 2018, Harris saw Jessie for another case management visit. (*Id.*, PageID.464.) During the visit, Jessie told Harris that he was depressed and linked his frustrations to the current facility. (*Id.*) Harris reported that Jessie has a "rigid, all or nothing" thinking style and has "thin-skin." (*Id.*) Jessie discussed his displeasure with Harris, stating that he felt Harris did not care about his mental health. (*Id.*) Harris challenged Jessie on this point by telling him the treatment team has supported Jessie's goal of getting to RTP. (*Id.*) Despite recent issues with SSOTP, Harris reported that Jessie is making progress by lowering his misconducts from the previous year. (*Id.*) Jessie had gone 8 months without a misconduct ticket until he engaged in a fight with another inmate in March of 2018. (*Id.*) Harris noted that Jessie blames his mental health for his misbehavior and gets angry when he is held responsible. (*Id.*, PageID.465.)

On August 7, 2018, Jessie attended group therapy with Harris. (*Id.*, PageID.467.) During this therapy session, Jessie showed that he was learning basic skills related to successful discharge from prison and prosocial change. (*Id.*) Harris reported improvements from Jessie's previous group therapy session, particularly in Jessie's skill building/understanding. (*Id.*)

On August 13, 2018, Harris visited Jessie for another case management meeting. (*Id.*, PageId.471.) During the visit, Jessie expressed that any aggression he had exhibited was because his mental health symptoms were poorly controlled. (*Id.*)

19

Harris reported that Jessie has been making progress in SSOTP but would benefit from more comprehensive therapy services offered at RTP.  (*Id.*)  On October 1, 2018, Harris discussed referring Jessie to RTP.  (*Id.*, PageID.473.)  Harris told Jessie that he would make the referral in approximately one month, but Jessie expressed annoyance at this.  (*Id.*)  Jessie indicated that he felt he was being treated differently from other inmates by being asked to wait.  (*Id.*)

On October 8, 2018, Jessie went to group therapy once again.  (*Id.*, PageID.475.)  Harris noted that Jessie had shown difficulty in managing his conduct and did not come to group therapy for two weeks.  (*Id.*)  However, Harris reported that Jessie continued to be a productive member of the group, and his regular comments showed that he had a good understanding of the material.  (*Id.*, PageID.476.)  In another group therapy session on November 29, 2018, Jessie appeared to be better managing his conduct.  (*Id.*, PageID.478.)  Further, Harris noted that Jessie was a continuously productive member and was able to graduate from the program.  (*Id.*)

On February 15, 2019, Harris saw Jessie for a segregation visit.  (*Id.*, PageID.479.)  During the visit, Harris noted that he could not assess Jessie's mental status because Jessie refused to cooperate.  (*Id.*)  While Harris spoke with Jessie, Jessie remained under his bed covers to ignore Harris.  (*Id.*)  Despite this, Harris told Jessie that he would be referred to RPT soon.  (*Id.*)

On April 9, 2019, Harris referred Jessie to RTP.  (*Id.*, PageID.482.)  In his referral, Harris noted that Jessie is mentally ill and had been treated for PTSD,

bipolar disorder, and ASPD.  (*Id.*)  Harris noted that Jessie typically exaggerates his symptoms for secondary gain.  (*Id.*)  Further, Harris noted that Jessie becomes easily slighted, and typically presents himself as a victim.  (*Id.*)  At other times, however, Jessie boasts of numerous illegal activities, including murder.  (*Id.*)  If someone expresses doubt towards Jessie's activities, Jessie becomes angry and hostile.  (*Id.*) Harris stated that RTP would be beneficial for Jessie to help improve his coping skills and non-aggressive behavior.  (*Id.*, PageID.483.)

Over the next few months, three different case managers worked with Jessie, Christine Carotenuto, Alfred Taylor, and Cheyenne Schultz.  (*Id.*, PageID.489-508.) Prior to seeing different case workers and starting RTP, Dr. Ravindra Polavarapu conducted a psychiatric evaluation of Jessie on May 6, 2019.  (*Id.*, PageID.485.) When Dr. Polavarapu discussed medications with Jessie, Jessie became argumentative. (*Id.*)

On July 12, 2019, Jessie began seeing Carotenuto for case management meetings.  (*Id.*, PageID.489.)  Carotenuto reported that Jessie had been observed yelling in the dayroom area, complaining of neglect.  (*Id.*)  During the meeting, Jessie claimed that he "wanted to be productive" and that he had heard the voice of his grandmother who told him that he was the reason she died.  (*Id.*)  Despite these claims, Jessie attended groups offered to him and appeared to be an active participant.  (*Id.*)  Jessie stated that he was being treated terribly at the facility, but Carotenuto noted that Jessie is the only inmate that feels this way.  (*Id.*)  Further, Carotenuto noted that Jessie swallowed some batteries in front of some officers when

he found that he would be transferred to another facility.  (*Id.*)  Carotenuto concluded that Jessie's claims of neglect are hard to believe given the amount of treatment and attention he was receiving at the time.  (*Id.*)

On July 18, 2019, Carotenuto again saw Jessie for a case management meeting.  (*Id.*, PageID.491.)  In this meeting, Jessie claimed that his Loss of Privilege (LOP) for 25 days for assaulting another prisoner, was denying him due process.  (*Id.*) Jessie discussed his current medication and stated that he did not want to be "the walking dead," claiming the medication made him miss group sessions due to side effects from the timing of his medication.  (*Id.*)  At Jessie's request he was allowed to take his medication at night.  (*Id.*)  Carotenuto noted that Jessie had been making progress by remaining medication compliant and not engaging in any self-harm.  (*Id.*) Ultimately, Carotenuto determined that Jessie was ready for transfer to RTP.  (*Id.*)

On July 31, 2019, Jessie met with Alfred Taylor for a case management meeting while he was in RTP.  (*Id.*, PageID.493.)  During the meeting, Jessie expressed frustration from being locked in his cell without property.  (*Id.*)  Taylor explained to Jessie that he would not receive his property until he made it to the next phase of RTP.  (*Id.*)  Jessie further complained that his medication was making his stomach hurt.  (*Id.*)  Taylor told Jessie that the medication would need to be crushed while he was in high security.  (*Id.*)  Jessie became irritable and stated, "you make me feel like I have to fuck someone up."  (*Id.*)

On August 8, 2019, Jessie began seeing Schultz for his case management meetings.  (*Id.*, PageID.495.)  In the first meeting, Schultz noted that Jessie had

22

recently received a threatening behavior misconduct and had been making disrespectful comments to staff. (*Id.*) Jessie expressed disappointment in his actions and responsibility for this recent misconduct. (*Id.*) Schultz decided to bring Jessie some handouts on anger management. (*Id.*) On August 9, 2019, Schultz completed a behavioral health observation. (*Id.*, PageID.498.) This observation was made partly because Jessie swallowed the arm of his eyeglasses and made a superficial cut to his arm. (*Id.*) During the observation, Jessie expressed paranoid and grandiose thinking, stating that he swallowed the glasses because his rights were being violated. (*Id.*, PageID.499.) Jessie explained that he swallowed the glasses so that he would be sent to a hospital where he could access a law library. (*Id.*) Jessie expressed a desire to work on his "case." (*Id.*) Jessie made further comments about harming himself, but explained he had no real desire to do so, only that he wanted to receive attention. (*Id.*)

On August 12, 2019, Schultz again observed Jessie. (*Id.*, PageID.500.) During this meeting, Jessie stated that he did not mean any of the things he said or did during the last week. (*Id.*) Jessie recognized that he acted impulsively because he was not getting the things that he wanted. (*Id.*) However, Jessie continued to claim that his rights were being violated. (*Id.*) The next day, Schultz observed Jessie again. (*Id.*, PageID.501.) Jessie explained that his recent behaviors were an attempt to manipulate placement. (*Id.*)

On October 15, 2019, Jessie met again with Dr. Polavarapu after being assaulted by another inmate. (*Id.*, PageID.502.) During his discussion with Jessie,

Dr. Polavarapu explained that some of the side effects Jessie experienced were from one of the medications.  (*Id.*, PageID.503.)  Jessie disagreed with the assessment and became argumentative.  (*Id.*)  Dr. Polavarapu claims that Jessie began cursing him out.  (*Id.*)  Jessie was then escorted out of the room.  (*Id.*)

On November 6, 2019, Jessie was seen by Lindsey Davis, a Certified Therapeutic Recreation Specialist, for a case management visit.  (*Id.*, PageID.506.) During the meeting, Jessie recognized that he has anger management issues.  (*Id.*, PageID.507.)  Jessie had been recently taken off one of his medications, Geodon, because he had been refusing to take it.  (*Id.*)  Jessie expressed that RTP did not seem to be working for him.  (*Id.*)  Davis opined that Jessie has little insight into his mental health and is adamant about not working with the psychiatrist, Dr. Polavarapu.  (*Id.*) Davis noted that when Jessie was in cognitive group, he attempted to take over the session and tried to get other inmates to support his line of thinking.  (*Id.*)  During one of the sessions, Jessie stated "I am intelligent, for changes to happen around here it will take someone like me to initiate them."  (*Id.*)

On December 12, 2019, Jessie began seeing Harris again.  (*Id.*, PageID.509.) Jessie had recently returned to MBP after RTP.  (*Id.*)  When Harris asked Jessie about the skills he learned while in RTP, Jessie was unable to identify anything that helped other than structured activities to keep himself busy.  (*Id.*)  Jessie blamed the clinical staff and custody for difficulties he faced while in RTP.  (*Id.*)  Jessie claimed that he was lied to about the program and that the staff and custody were corrupt.

(*Id.*)  Harris noted that the discussion further highlights Jessie's difficulties in having effective, working relationships.  (*Id.*)

On March 2, 2020, Harris completed an annual aftercare assessment plan. (*Id.*, PageID.512.)  Harris wrote that Jessie had been discharged from RTP due to misconduct and poor relationships with the treatment teams.  (*Id.*)  On April 21, 2020, Harris completed a mental health progress note.  (*Id.*, PageID.513.)  In this note, Harris reported that Jessie stated that he needed a myotonic muscular dystrophy (MMD) diagnosis so that he could make a disability claim when he is paroled.  (*Id.*) Jessie began venting about his disappointment with his current treatment team.  (*Id.*) The venting only ended after Jessie became emotionally exhausted.  (*Id.*)  Towards the end of the meeting, Jessie expressed that he would use any means to get what he wants even if it requires aggression.  (*Id.*)

On May 6, 2020, Harris visited Jessie for a restrictive housing review.  (*Id.*, PageID.514.)  During the meeting, Jessie stated that he was "not that suicidal right now."  (*Id.*)  Jessie claimed that he was not receiving appropriate mental health treatment.  (*Id.*)  On May 14, 2020, Harris completed another mental health progress note.  (*Id.*, PageID.515.)  During the meeting, Jessie expressed anger with Harris and believed his relationship with the case manager was unsolvable.  (*Id.*)  Harris discussed re-establishing the working relationship and gave Jessie the time to express his frustrations with the process.  (*Id.*)

On June 29, 2020, Harris completed another progress note after speaking with Jessie.  (*Id.*, PageID.518.)  Jessie stated he was depressed during the interview, but

Harris believed Jessie was just irritable.  (*Id.*)  Jessie did not show up for a previous meeting with Harris.  (*Id.*)  Jessie's reasoning for missing the meeting was that he did not like Harris.  (*Id.*)  Jessie reported to Harris that he was currently seeking a job in the prison.  (*Id.*)  During the meeting, Jessie said he planned on "bugging out" in a few months to get back down state.  (*Id.*)

On September 8, 2020, Harris wrote another progress note for Jessie.  (*Id.*, PageID.519.)  Harris opined that Jessie's claims of depression are due to Jessie believing he should be treated differently.  (*Id.*)  Harris noted that Jessie accurately reported recent gains, such as 5 months without a ticket and receiving a TV.  (*Id.*) Jessie stated he had a desire to go to Woodland Center Correctional Facility (WCC). (*Id.*)  Jessie expressed frustration with not receiving a job placement, blaming it on his "unfair treatment."  (*Id.*)  Further, Jessie said he would give it a "few weeks" before using it as a pretext for behavior that would get him transferred to WCC.  (*Id.*)

On November 25, 2020, Harris completed a suicide risk assessment of Jessie. (*Id.*, PageID.523.)  In this assessment, Harris reported that Jessie had a low suicide risk.  (*Id.*, PageID.524.)  Since placement in restrictive housing, Jessie had not been a management issue.  (*Id.*)  Jessie indicated that he was ready to go back to general population and would be able to manage with other inmates.  (*Id.*)  Harris opined that any crisis that Jessie was suffering from appeared to be over.  (*Id.*)

On December 3, 2020, Harris completed another mental health progress note. (*Id.*, PageID.525.)  During their meeting, Jessie expressed that he was being ignored by staff and not being treated according to policy.  (*Id.*)  Jessie stated that his last

self-injurious behavior occurred when he "temporarily lost control." (*Id.*)  The nurse noted that a recent psychotic event by Jessie lasted a short time, suggesting that it was dysregulation which is typical of his personality disorder.  (*Id.*)

On December 16, 2020, Harris conducted another restrictive housing review. (*Id.*, PageID.526.)  Harris noted that Jessie was managing his mental wellbeing by reading and working on legal work.  (*Id.*)  During the meeting, Jessie expressed frustration once again with custody and staff at the prison, believing them to not be doing their jobs.  (*Id.*)

On January 14, 2021, Harris completed a mental health progress note.  (*Id.*, PageID.528.)  Jessie had recently been put in observation because of self-injurious behavior.  (*Id.*)  Jessie expressed anger with the healthcare and custody staff, again insisting that they were not doing their jobs.  (*Id.*)  He began discussing his anger with another inmate who told him not to assault staff.  (*Id.*)  Shortly thereafter, Jessie stated that he cut his arm instead of assaulting staff, recognizing that it was impulsive behavior.  (*Id.*)  Further, Jessie stated that his situation in segregation "got the best of me and I lost control." (*Id.*, PageID.530.)  Harris indicated that staff would place Jessie on moderate precautions.  (*Id.*)  On February 11, 2021, Harris conducted a suicide risk assessment.  (*Id.*, PageID.531.)  Jessie discussed that he felt triggered by the staff he did not like.  (*Id.*, PageID.532.)  Jessie further expressed desire to change his behaviors and to not engage in further self-injurious behavior.  (*Id.*)

On March 1, 2021, Harris conducted another suicide risk assessment.  (*Id.*, PageID.534.)  Prior to the assessment, Jessie was listed as under high precaution and

in crisis due to recent suicidal ideation. (*Id.*, PageID.535.) Jessie expressed continued anger and did not want to talk about his situation with Harris. (*Id.*) During their conversation, Jessie expressed that he may eventually decide to harm himself or assault staff, but at the time was making no plans to do so. (*Id.*) After assessing Jessie, Harris placed him on moderate precaution. (*Id.*) On March 10, Jessie expressed to Garrett Green, a licensed professional counselor (LPC), that he was suicidal because staff "gave me dirty cells and write bogus tickets." (*Id.*, PageID.536.) The LPC noted that Jessie appeared to be using his anger for secondary gain to manipulate others. (*Id.*)

On April 5, 2021, Harris wrote a mental health progress note after speaking with Jessie about his desire to return to regular handling. (*Id.*, PageID.537.) On April 7, 2021, Harris conducted another suicide risk assessment. (*Id.*, PageID.538.) Harris was asked to make this assessment after Jessie made a suicidal statement during his escort to segregation to a cell. (*Id.*) Jessie blamed Harris and other staff for the incident and would not discuss the situation further. (*Id.*, PageID.539.) Despite the suicidal statement, Jessie was observed on camera, approximately 45 minutes after speaking with Harris, talking and laughing with another inmate in observation. (*Id.*)

On June 17, 2021, Harris completed another suicide risk assessment. (*Id.*, PageID.545.) According to custody, Jessie said he was suicidal and going to cut himself if he was not taken to observation. (*Id.*, PageID.546.) During their meeting, Jessie never assured his safety but stated that "I'm on camera, aren't I?" (*Id.*) Jessie

made no suicidal gestures besides the statement he had made to custody staff.  (*Id.*)  On August 3, 2021, Harris completed another suicide risk assessment.  (*Id.*, PageID.547.)  During the assessment, Jessie stated that he made his previous suicidal statements to get medical attention.  (*Id.*, PageID.548.)  Jessie was transparent about his motives in making his suicidal statement and did not exhibit any other risky behavior.  (*Id.*)

On September 20, 2021,  Harris conducted another suicide risk assessment. (*Id.*, PageID.549.)  Jessie exhibited frustration with custody staff for taking him to a "dirty cell." (*Id.*, PageID.550.)  Upon arriving at the cell, Jessie placed a sheet around his neck saying he was suicidal.  (*Id.*)  Harris noted that Jessie has a long history of self-injurious behavior in an effort to change his confinement conditions.  (*Id.*)  In another suicidal risk assessment done by LPC Green on October 6, 2021, Jessie made suicidal comments only after a camera was on him.  (*Id.*, PageID.552.)

On October 11, 2021, Harris conducted another suicide risk assessment, after Jessie had assaulted staff and threw feces.  (*Id.*, PageID.553, 554.)  Jessie denied having unmanageable depressive symptoms and stated that he is always angry.  (*Id.*)  Jessie stated he wanted to remain in observation until he had an opportunity to speak with Harris.  (*Id.*)  Since his placement in observation, Jessie had not exhibited any additional risky behavior.  (*Id.*)  Jessie expressed some feelings of depression, but the assault on staff appeared to be related to Jessie's ASPD.  (*Id.*)

On October 14, 2021, Harris wrote a mental health progress note after meeting with Jessie.  (*Id.*, PageID.555.)  Jessie told Harris that the prison was making him

depressed.  (*Id.*)  Harris suggested that Jessie was doing better in his relationships with mental health personnel after previous bad interactions.  (*Id.*)  Jessie further discussed his goal of returning to RTP to work on his mental health.  (*Id.*)

On December 9, 2021, Harris made a referral for Jessie to reenter RTP.  (*Id.*, PageID.556.)  Harris made the referral due to Jessie's history of mood-swings and self-injurious behavior.  (*Id.*)  Harris believed Jessie lacked the skills necessary to manage his self-injurious behavior and aggression to staff.  (*Id.*)  These behaviors, according to Harris, have prevented Jessie from being able to progress to a lower level of confinement.  (*Id.*)  Harris noted in the referral that Jessie's treatment plan has been focused on impulsivity and reducing self-injury, but these behaviors remain a risk. (*Id.*)  Harris opined that Jessie would benefit from services that allow daily staff interventions, counseling, and treatment groups that teach skills relevant to Jessie's mental health needs.  (*Id.*)

On January 1, 2022, Debra LeBlanc conducted a suicide risk assessment of Jessie.  (*Id.*, PageID.557.)  Jessie was referred for this assessment due to his threat of self-injurious behavior.  (*Id.*)  An MBP RN made the referral, stating that Jessie "was mad because he wanted to be moved to another unit, so he pretended to cut himself by opening up an old wound."  (*Id.*)  The injury resulted in minimal bleeding for Jessie.  (*Id.*)  Jessie was then moved and seemed to be ok with his new housing. (*Id.*, PageID.558.)

On February 25, 2022, Harris conducted a treatment team review of Jessie. (*Id.*, PageID.559.)  Jessie expressed positive emotions regarding his legal case.  (*Id.*)

30

Jessie and his care providers went over his treatment plan, which Jessie felt addressed his current goals and mental health problems. (*Id.*) During the review, Jessie expressed interest in learning more about his ASPD diagnosis. (*Id.*) Jessie discussed his desire to go back to RTP to work on his self-injurious behavior, anger, and suicidal thinking. (*Id.*) Jessie also believed RTP would help him as the environment is more therapeutic and has more group sessions. (*Id.*) Harris noted in his report that Jessie is currently on the referral list and is awaiting transfer to RTP. (*Id.*)

On March 7, 2022, Harris conducted another suicide risk assessment of Jessie. (*Id.*, PageID.562.)   Jessie was again placed in observation after self-injurious behavior. (*Id.*, PageID.563.) Jessie claimed the self-injury was to get away from the segregation unit because he was having difficulties with a corrections officer there. (*Id.*) Harris told Jessie that he should contact a mental health worker rather than resort to self-injury. (*Id.*) Jessie responded that he wanted out of the unit that night and did not want to wait. (*Id.*)

On March 14, 2022, Harris wrote a mental health progress note. (*Id.*, PageID.564.) Jessie expressed frustration and complaints with custody staff in his current unit and wanted to vent to Harris. (*Id.*) Harris validated Jessie's use of mental health providers to process any issues that Jessie had with staff. (*Id.*) Harris also informed Jessie of the grievance process if he had any other issues with correctional staff. (*Id.*)

On March 16, 2022, Harris conducted a suicide risk assessment. (*Id.*, PageID.565.) Jessie had recently cut his arm, which required medical attention, but he did not intend to end his life through self-injury. (*Id.*) Again, Jessie was placed in observation. (*Id.*) Jessie expressed to Harris that he was sexually frustrated and having difficulty with staff. (*Id.*) Jessie told Harris that his reasoning for self-injury was again to get into observation and to reduce his stress. (*Id.*) He further told Harris that the self-injury helped him feel better. (*Id.*)

On March 24, 2022, Harris completed a mental health progress note after Jessie requested to speak with him. (*Id.*, PageID.567.) Jessie requested to speak with Harris, because of the cell conditions and his displeasure with the staff in his unit. (*Id.*) Jessie expressed that he did not trust his unit staff. (*Id.*) Jessie said he could see himself cutting himself again.

On April 6, 2022, Cindy Miller completed a transfer intake into RTP for Jessie. (*Id.*, PageID.575.) The intake reported that Jessie had been referred to the program because of mood swings and recurrent self-injurious behavior. (*Id.*) On April 21, 2022, Miller wrote a mental health progress note. (*Id.*, PageID.576.) Miller reported that Jessie expressed anger during a group session because he was not called out to speak. (*Id.*) After the group session, Miller talked to Jessie about his agitation with an officer present. (*Id.*) Jessie told her that he was not going to speak with her in front of an officer. (*Id.*) Subsequently, Jessie left the office. (*Id.*)

On May 19, 2022, Miller completed a mental health progress note on Jessie. (*Id.*, PageID.577.) Jessie had recently sent a kite requesting an LOP waiver. (*Id.*)

Miller informed that he was not eligible for an LOP waiver for another 10 days.  (*Id.*) Jessie discussed gardening and its potential therapeutic benefits for a few minutes. (*Id.*)  Jessie expressed a previous desire to assault staff because he felt he was being mistreated.  (*Id.*)  Shortly after speaking with Miller, Jessie monopolized a Writing for Mental Health group in RTP by complaining of his mistreatment by custody.  (*Id.*) Jessie further talked about his pending lawsuits and how he had assaulted others in the past and performed self-injury for perceived mistreatment.  (*Id.*)  When another prisoner began to speak, Jessie cut them off by yelling that they were off topic.  (*Id.*) He continued to become irate and yelled about the mental health staff and then stormed out of the room.  (*Id.*)

### iii.  Jessie's Deposition

Jessie explained that he sued Mark Hares, because he did not properly supervise Jessie's caseworker, Larry Harris.  (ECF No. 72-4, PageID.427-428.)  (*Id.*) Next Jessie clarified his claims against Harris by stating they revolved around a May 20, 2020, mediation.  (*Id.*, PageID.428-429.)  The mediation was called because Jessie requested another case manager instead of Harris.  (*Id.*)  Jessie claims that things got worse after the mediation meeting.  (*Id.*)  At the end of the meeting and out of Hares's earshot, Jessie claims that Harris said to him, "You are a fucking crybaby, and if you need any favors in the future, you're going to have to eat my dick for it." (*Id.*, PageID.429-430.)  Jessie interpreted the comment as Harris saying that Jessie does not deserve to be swapped caseloads and as sexual harassment.  (*Id.*,

PageID.431.)  Jessie could not recall any similar comments made by Harris.  (*Id.*, PageID.432.)

Jessie also claimed that Harris refused to send him to WCC for a more therapeutic program.  (*Id.*)  In Jessie's opinion, WCC was the best place for him to finish his treatment.  (*Id.*)  Jessie also believed that a transfer to WCC would help him properly evaluate his medicines as he felt they were not effective at MBP.  (*Id.*)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "When opposing parties tell two stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.  Analysis

Jessie claims that the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment, and to receive adequate mental health treatment when there is a substantial risk of injury.  (ECF No. 1, PageID.2.)  Jessie claims that the treatment he received while at MBP from Defendants was inadequate, and therefore is evidence that the Defendants were deliberately indifferent to his mental health needs.  (*Id.*)

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  This includes a prisoner's serious psychological needs, "especially when they result in suicidal tendencies."  *Comstock*, 273 F.3d at 703 (quoting *Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting A*lspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment. *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004) (reiterating that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate treatment).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under Farmer, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). There, the court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor,

37

and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of serious harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

As an initial matter, there is no question that Jessie received prompt and continuous mental health care from the time he arrived at MBP to the time he filed this lawsuit. (*See* ECF Nos. 72-6, 77-3.) Jessie's mental health records demonstrate that he was regularly seen and extensively treated by Defendants and other MDOC mental health care staff. (*Id.*) Jessie was frequently seen by Defendant QMHP Harris and during those visits, Harris noted Jessie's subjective complaints and concerns. (ECF No. 72-6.) And NP Boudreau clearly considered those requests, increasing or otherwise altering Jessie's psychiatric medication on numerous occasions to best address Jessie's symptoms. (ECF No. 77-3.) Boudreau diagnosed Jessie with PTSD, polysubstance dependance, and ASPD. (ECF No. 77-2, PageID.811.) Bourdeau's findings were corroborated by Dr. Terry Meden. (*Id.*)

Moreover, Hares noted he did not believe there was a compelling clinical reason to recommend a new case worker for Jessie. (ECF No. 72-3, PageID.419-420.) Hares conducted a formal investigation of the alleged sexual remarks made by Harris and found that Jessie's claims were unsubstantiated. (*Id.*, PageID.420.) Finally, Hares

attests that there was no indication that Jessie was not receiving proper treatment or that Harris harmed Jessie's mental health.  (*Id.*)

Because it is clear that Harris, Hares and Boudreau provided Jessie with continuous mental health care, Defendants are correct in asserting that to establish the objective component of his claims, Jessie had to demonstrate that the care was "woefully inadequate" and had a "detrimental impact" on Jessie's wellbeing.  In the undersigned's opinion, Jessie has not made these demonstrations.

As set forth above, a plaintiff alleging claims of deliberate indifference must establish that each defendant acted with a mental state "equivalent to criminal recklessness."  The continuous nature of the care that Hares, Harris and Boudreau provided Jessie, and the fact that they considered Jessie's complaints and at times adjusted his treatment according to those complaints, undermines any assertion that they acted with "criminal recklessness."  By all indications on the very extensive treatment record outlined above, Defendants acted with due care, by consistently addressing Jessie's concerns and condition, and then by providing him with various treatment options.  To find otherwise, this Court would have to second-guess Defendants' medical judgments, a task that courts do not undertake in the context of a deliberate indifference claim.

Finally, Jessie's Eighth Amendment claim against Harris for sexual harassment also fails as a matter of law.  First, although Jessie claims that Harris made sexually harassing remarks on more than one occasion, (ECF No. 1, PageID.2), Jessie stated at his deposition that Harris had not made a similar at any other time.

(ECF No. 72-4, PageID.432.)  Assuming the truth of Jessie's assertion, the alleged comment was vulgar and inappropriate.  However, that is not enough to support an Eighth Amendment cause of action.

The Sixth Circuit has held that "isolated, brief, and not severe" instances of sexual harassment, without more, do not give rise to Eighth Amendment violations. *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005) (finding that harassing comments, even coupled with one minor instance of sexualized touching during a search, fall short of an Eighth Amendment violation), *abrogated in other part by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Violett*, 76 F. App'x at 27 (an offer of sexual favors is not sufficient to state Eighth Amendment claim); *Johnson v. Ward,* No. 99-1596, 2000 WL 659354, at *1 (6th Cir. May 11, 2000) ("Johnson's allegation that Ward made an offensive sexual remark to him does not rise to the level of a constitutional violation [as such is merely verbal abuse].").  Other courts have agreed. *See, e.g., Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003); *Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir. 1996); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1986).  In the opinion of the undersigned, Jessie's alleged Eighth Amendment sexual harassment claim fails short.

### V. State Law Claims

As mentioned above, Jesse asserts various state law claims in addition to his federal claims.  In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against

needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.*  Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).  In the opinion of the undersigned, it is recommended that the Court decline to exercise supplemental jurisdiction and dismiss the State law claims.

## VI.  Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment because there are no genuine issues of material fact on Jessie's Eighth Amendment claims.  Further, the undersigned respectfully recommends that the Court decline to exercise supplemental jurisdiction over Jessie's state law claims.

If the Court accepts this recommendation, this case will be dismissed.


Dated:  October 3, 2024                          /s/ *Maarten Vermaat*
                                                 MAARTEN VERMAAT
                                                 U.S. MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).